On the 11th of May 1965, the lawyer against Bed Bath & Beyond, Mr. Shelowitz. May it please the Court. My name is Mitchell Shelowitz of the law firm Carl Cohen Sedeglazer, and we represent the appellant, Mr. Roger Hall. Your Honors, we're here today to seek rehearsal of what we view as a grave miscarriage of justice by the lower court. Despite meeting the stringent pleading requirements required under Rule 12b-6 in the Second Circuit, as well as in the Federal Circuit for pleading patent infringement cases, the lower court has decided, sua sponte, to dismiss those claims. And we believe this needs to be addressed with a remand and an instruction from the lower court. In short, we have two issues before the Court today. The first is whether the lower court, Judge Hellerstein, imposed a heightened pleading requirement for a design patent infringement case, beyond any judicial pronouncement to date, and also whether the sua sponte determination to dismiss the claims was proper. Secondly, whether the Court's erroneous construction of the 439 patent from the beginning, from the preliminary injunction hearing, during the decision, dismissing the case was proper. It's a matter of law. We're here to talk about a towel, Your Honors. It's a towel, a design patent our client received. It's an elongated towel. It has a loop in the middle to make a peri cloth. It has piping around the edges. So even though it concerns a towel, the argument won't be too dry. Exactly. We will not be throwing a towel today, Your Honor. And our client applied for a patent. He received a patent. And during the period of time in which the patent was pending, he manufactured towels. He indicated very clearly a patent pending on his towels on the label and the packaging. He met with the appellees with Bed Bath & Beyond and showed them this towel. And for the purposes of trying to have a manufacturing and distribution relationship with them, they declined. About a year later, following the issuance of his patent, he found through one of his customers who was buying the towels, noticed towels that looked virtually identical to his towels in Bed Bath & Beyond. And we look at the towels that were manufactured by the appellees as not only substantially similar, but virtually identical, with the zippers being in the same location, the loop being in the same location on the towels, with the piping around the terry cloth being in the same location as well. Visually, virtually identical. And in the case with the lower court, what the judge decided to do on his own was, rather than looking at the tweeting standards at a well-settled meeting, that we have to allege in the complaint that there is a patent that's been issued, that there's been some kind of infringement, and we allege that there was a manufacturing sale. Well, one of the problems in this case, Mr. Cholowicz, is that too many issues were thrown at the district judge. And so, I nearly got to the design patent issue at the end, and got through the state law and land act, and you started focusing on the patent issue first. That's correct. What was wrong with this decision? Well, number one, we look at it as a misunderstanding of the standards applicable to design patents. He forgot about it, didn't look at the Egyptian goddess cases at all, didn't look at the substantial similarity. He looked at each individual element of the design. But doesn't a design consist of elements? The design consists of elements, but as we know, based on the case law coming out of this court, the approach to the analysis is to look at the design in its entirety. Didn't he ask what was distinctive, and he didn't get an answer, and he offered an opportunity to re-plead, which was not accepted? Well, we view his allowance or the opportunity to re-plead as something that would be futile. I mean, if we look at the questions that the judge asked in the decision for his determination of why the claims could not survive in 12b-6 or the sua spondi was, he wanted to know what exactly, what aspects of the talent merited design protection. Okay, rather than taking the approach of looking to see whether there was substantial similarity, he looked at his role as being a patent examiner to determine. But you could have dealt with that and re-pleaded, but you said, no, forget about it, we'll go upstairs and you'll ignore his opportunity to re-plead and to deal with exactly what you're now saying. Well, the reason why we felt that it would be futile, frankly, and if we look at the cases that McZeel, for instance, and photogenics as well, the, sorry, photometrics decision, this court held and permitted that it looks like it's going to be futile to re-plead, as we saw in this case, that we could have re-pled, that the court was asking us to re-plead elements that were not part of the appropriate analysis for a design patent infringement. Well, what's inconsistent with the district court's posture and our recent decision in the Richardson versus Stanley works that recognized that even under the Egyptian goddess and looking at the ornamental appearance of the design as a whole, certain aspects of design patents may be functional and may not be entitled to a scope of coverage. And the scope of coverage of the design patent is restricted to the ornamental aspects. Is the district court here doing anything other than saying that if you're looking for an effective pleading post, I think, bar and plumbly, then for a design patent case, you have to at least identify what ornamental aspects you believe are covered and where they are found in the accused structure. With regard to the Richards case, and we actually addressed this with the court in connection with the preliminary injunction, and the way we look at these ornamental features, the loop, the piping, the location of the zippers, these are purely ornamental. They're not driven by function, meaning the zippers act as closed pockets, but they don't have to be in the same location where they are on the towel, on either end, within six or eight inches from the end of the towel. They could be anywhere else, but they still have a function of a pocket or a closed zipper. It's not driven by functionality. The same thing with the loop. It's a loop. It's an ornamental loop that has a function, has a function. I mean, I hear what you're saying, but is the question, then, to what extent in this post-Iqbal, Twombly world are those sorts of ornaments required in an effective case? We believe that we more than satisfied those Twombly and Iqbal requirements because we pled the existence of the patent. We pled the interactions between the appellees and the appellant. We pled the fact that there was a substantial similarity between the embodiment of the patent as well as the appellee's infringing product. But you didn't plead any of the things you were just discussing a moment ago. We believe that we have. We believe that in that complaint is everything that's necessary in order to give rise at a very basic level and put the defendants on notice or the appellees. And, in fact, more than that, the appellees, in a motion to dismiss, they move to dismiss all the non-patent claims. And on the patent claim, they acknowledge in their pleading, in their motion to dismiss, although we disagree that there's an infringement, we believe that it's properly pled. So, clearly, they were on notice. And that's what all with Twombly and Iqbal and all the case law that started back with 12b-6. They were on notice. They knew what they needed to respond to. And they chose not to move to dismiss that claim. And the judge, instead, applied some kind of circuitous analysis, which did not apply any of the controlling case law to make a determination that not only was there no infringement, but that we didn't even put the other side on notice, that it was confused and it was hard to follow. And we view that as plainly incorrect. We view it as the court not understanding the appropriate standards. And, again, the court is not in the seat of the patent examiner. And that's the kind of questions that we saw, going back to Judge Lori's inquiry before, the questions of what in the talent merits a patent? What's patentable? This is a 12b-6 motion. All facts and the allegations are supposed to be taken as true. The court, instead, decided he was going to be a patent examiner and ask questions and inquiries that were inappropriate to this type of analysis. Was the district court saying what aspect of this is patentable? Or was the district court saying to what extent is this patent infringed? Now, I realize the language is a little bit unclear. The language does seem to suggest that he was asking about validity. But in context, you could say that all he was really saying is, tell me where there's infringement. Tell me how this infringes. That's not what we see. If we look at the record 815 and 816, the questions that are clear and they speak to themselves. What is it about plaintiff's talent that he claims is new, original, and ornamental? That's not an infringement inquiry. It's a patentability inquiry. What aspects of the 439 patent does the appellee's talent infringe? We say, if we look at the ornamental features in their entirety, and we do a side-by-side analysis, and we show photographs, and we've delivered to your honors actual towels, you can see that these towels are virtually identical. A purchaser of our client's towel believed that the towels being sold at Bed Bath & Beyond were our client's. And she called him angrily, asking why he was selling his towels so cheaply to Bed Bath & Beyond when she was paying double the price. But there would be, at some point, an obligation on your part as the patentee to explain to the court what aspects of the design are ornamental and what aspects are functional. Correct? That would normally be done as part of the claim construction analysis. But did you discuss it with the court? I must say, I was not so sympathetic to the abandonment of the point of novelty argument. There were a lot of ambiguous briefs and a lot of discussion. And the transition to the overall impression standard. But did you get a chance to discuss that with the court? We discussed it in our briefs, in our opposing briefs. We had oral arguments scheduled, and the court suicidally canceled our oral arguments. But we did address Egyptian goddess. We did address, even at the preliminary injunction hearing, I sat with the judge next to him, and I went through why I don't believe that those elements, they may have a function. But their functionality is not driven by the location of the ornamental features in the towel. And again, it's the piping, it's the loop. They could be together, they would still function as a pocket. The loop would still function as a hanger, but it's the overall design, the way it looks, that the Pele's infringing products are identical, the same location of the loop. It doesn't have to be in the middle of the towel for it to function as a loop. The zippers don't have to be in the same identical place on either side of the towel for them to function as pockets. They could have been anywhere else in any other angle. And similarly with the piping, towels ordinarily don't have piping around the edge. I mean, we have seen many towels, no piping. So we view these features not as, they may have a function, but the functionality is not being driven by the location of these ornamental features on the products. Okay, let's hear from the other side. Thank you. Thank you. Ms. Woodson. Good morning. Laura White Swan, on behalf of Bed Bath & Beyond, West Point Home, and Barlow, Michigan. The plaintiff pled one patent claim against three separate defendants under three separate theories of infringement, and all the district court asked for was that his patent claim be pled in a coherent fashion. The court has identified that on page A16 of the record, what the district court asked was, please explain the means of infringement. Identify what features of the design patent are ornamental, and explain to us how the accused product accused how infringed those. But isn't that the problem that we're discussing? Egyptian goddess changed that. Well, Egyptian goddess gave us the test for infringement. What the district court asked the plaintiff to do was to identify those aspects of the patent that are ornamental. Nothing in Egyptian goddess changed the requirement that a court filter out functional elements from a design patent before we look at the issue of infringement. But isn't that a matter of claim construction? In Egyptian goddess, what the federal circuit decided is that a court does not necessarily need to articulate a claim construction in the way we would do with an ordinary utility patent under the Markman proceeding. But it also said that a district court, one of the useful things they can do for a jury, is to identify and to separate those issues that are functional, those elements that are functional, from those that are ornate. In fact, the Richardson decision went back and said one of the helpful things that a district court can do for the fact finder is to identify those aspects of a design that are ornamental versus those that are functional. And that was considered in the context of interpreting the claims, interpreting the scope, if you will, of the design patent. Correct. We don't have any requirement in a pleading for a utility patent infringement that the plaintiff identify or provide the court with some claim construction, do we? No. The most recent case to address this is McZeal. It involved a pro per plaintiff who had identified the accused product by model number. And the court found that because the pleading was consistent with Form 16, that it was adequate under Federal Rule of Civil Procedure 84. The court did distinguish McZeal in a number of respects, including the fact that the plaintiff had specifically identified the means by which the defendant's infringed. In fact, that's what phonometrics describes as well, is that the plaintiff has the obligation to describe the means by which a defendant infringes. Now, in a utility patent, I can go to the end of the patent, and I can look at the number of claims, and I can understand what a patentee considers to be the scope of his invention. I can't do the same thing … Well, you don't necessarily fully understand that until there is a claim construction, correct? Correct. And one of the things that the phonometrics decision said is that we're not going to require a plaintiff to go back and replead infringement after claim construction and to identify each new element in light of a changed claim construction. So, I mean, why should it be any different for a design patent? Because one of the things that we don't know, and in this case illustrates that point very well, is what an inventor deems to be ornamental versus functional. In this particular case, at the preliminary injunction hearing, plaintiff's counsel identified three elements as being ornamental, the location of the zippers, the location of the loop, and the piping surrounding the towel. But it's obvious the defendant is on notice in the pleading of what is being alleged in terms of the ownership of a patent, the accused product, and, in this case, some general description of the infringement. Isn't that enough for purposes of pleading? Even post-Iqbal and Twombly, and the issues that you're discussing are issues that would normally come out in the first round of discovery. Well, I've sat through many conferences recently where there's been a great debate among some of the district judges whether Iqbal and Twombly, in fact, changed the pleading standard beyond that, what McZeel phonometrics required. But with respect to the standard that exists in this court right now, what is required is articulating the means by which an individual infringes. Now, in this particular case, when you're looking at a design patent, there is nothing that describes for us in the pleading or puts us on fair notice or the district court on fair notice of what it is that we are alleged to infringe, what ornamental aspects. And to illustrate the lack of fair notice in this case, whereas there were three elements that were identified during the hearing of the preliminary injunction, by the time we brought a Rule 11 motion, there was a laundry list of elements that we purportedly infringed, including the quality of the fabric and the color of the piping, which were clearly not patentable. Let me get back to the utility patent context. If a patent is asserted as being an infringed utility patent, and the pleading doesn't even have to identify the claim, it's just the patent, I own this patent, it's infringed, there would be nothing in that pleading normally that would say, whether you infringe Claim 1 because elements A, B, and C read on this aspect of your product and elements D, E, and F read on that aspect of your product. So I'm again trying to find out why there should be different standards that apply for a design patent. Let me answer that question in two parts. The first part is that I believe it is appropriate for this court to reconsider whether the pleading standard has changed in light of Iqbal and Tuomly. At the time the zeal was decided, we only had the Tuomly decision. And now Iqbal has gone one step further and clarified that it applies to all cases, not just the two antitrust case issues that were decided in Tuomly. And additionally, Iqbal reinforced that we have to go beyond just a possibility infringement to sustaining a plausible violation of the law. And it would be appropriate for this court to revisit its jurisprudence on the pleading standard in light of both Iqbal and Tuomly in a context that does not involve a probe or plaintiff with a reduced burden of pleading. So I do believe it's appropriate for this court to revisit whether there is fair notice in light of Iqbal when a patentee can identify a patent that has hundreds of claims. Honestly, that doesn't provide fair notice to any defendant of what they're supposed to defend, and more importantly, what it is they're supposed to be preserving in terms of evidence. I mean, one of the important things of the pleadings is it frames the scope of the litigation, and it frames the scope of an accused infringer's preservation obligation, preservation of evidence. And that's one of the issues. Yes, there are many jurisdictions now that have local rules that will provide some notice early in the process of what the infringement contentions are, but that's not true of every jurisdiction. So even as to utility patents, I would suggest that the time has come for clarifying the standard of pleading with respect to utility patents. But a design patent is more in the nature of a trade dress claim, where a trade dress, you would have some aspects of a design, perhaps a product design or product packaging, where certain elements were alleged to be infringed. And with respect to trade dress claims, we require any plaintiff in a trade dress case to identify those aspects of its product packaging or product design that are unique. And similarly here— Maybe there's a distinction in that for a utility patent, at least even if there's some debate about the meaning of individual elements, the claims do spell out, limitation by limitation, the meets and bounds of the scope of coverage, whereas in a design patent, you don't have much guidance. It's just that I claim everything that's shown in the rule. You don't have much guidance, and let me illustrate that in this particular patent. The plaintiff has repeatedly said in the briefing that something about the location of its pockets and the location of the zippers is entitled to protection. Well, if we look at the figures in the patent, figure 7, for example, shows those pockets on a diagonal edge, whereas in figures 5 and figure 6, it shows them at a right angle. So when the plaintiff talks about the location or the placement of the zippers as being something that is ornamental feature of this one claim, it's difficult for us to even know what's claimed given that those pockets are depicted in different ways, and that may raise validity issues later. But this case, I think, illustrates the difficulty for judges who are trying to decide, in this particular case, they had to decide a preliminary injunction early. And one of the things that Iqbal reinforced is that the pleading standard is something that's going to be context-specific, and that judges should use their common sense and judicial experience in deciding what is an appropriate level of pleading. And there is something different about a design patent than a utility patent. This court does not necessarily need to decide issues relating to utility patents today. But there is something about a design patent that is unique and that does not provide the fair notice that Iqbal contemplates. At this point in time, I don't know what the plaintiff considers to be ornamental. I don't think the district court, having sat through a preliminary injunction hearing, having— I think this is the problem that I'm really trying to resolve in terms of the position here. When you say you no longer know what the point of novelty is, because the point of novelty criteria is now the design as a whole, its picture, its view, and the pictures are in the patent. Correct. Egyptian goddess did set out that test for infringement. But reading from Richardson, if I might, and this is describing what the court did in Egyptian goddess, it said, And we also emphasized, referring to Egyptian goddess, that there are a number of plain scope issues on which a court's guidance would be useful to the fact finder. Among them, we specifically noted, is the distinction between the functional and ornamental aspects of a design. And I'm quoting from page 1293 of the Richardson decision. And all the district court asked here of the plaintiff was— In the context of Egyptian goddess, which is easy enough to do. And Egyptian goddess itself said, and held, that where that particular district court had attempted to articulate a verbal or written description of the claim, that that was an error. It was within the court's discretion. It said, we're not going to require a district court to do that, but it's certainly within their discretion. And it specifically talked about the language that I quoted from Richardson where, Among the helpful issues that a district court can provide guidance to a fact finder is separating out ornamental and functional. And what the district court did in granting leave to amend— And again, this was an opportunity for a plaintiff to clarify his claim that he rejected, he refused to even attempt to separate out the inducement claim from the direct infringement claim. And we haven't even talked about inducement. And just, I would add very briefly that there's no allegation that any of the defendants had knowledge of an issued patent. And there are no factual allegations as to whether there was the type of activity that would support an inducement in the act of aiding and abetting. You're saying the complaint needs to include all of the factual allegations? I am saying that post-Iqbal, that it is not sufficient to merely allege inducement. There is no decision of this court that addresses the pleading standard for an inducement of infringement. The district courts right now are split on the issue. Half of the courts have found that under Iqbal and Twombly, there is a requirement of pleading more than the prima facie elements of an inducement claim. But setting aside whether there's a heightened standard post-Iqbal and Twombly, this plaintiff has not even alleged knowledge of an issued patent, which is required in the DSU. So even regardless of whether there's an elevated standard and whether that's appropriate, and this would be a unique opportunity for this court to clarify that issue of law for the district courts. But setting aside that, there's not even the boilerplate prima facie elements of an inducement claim with respect to the three defendants. And so, again, the district courts simply ask that this plaintiff plead his claim in what he's described as a coherent fashion, and among other things, to identify the means in which the defendants infringed. And that just didn't happen here. He had the opportunity, and instead of availing himself of that, he decided he was going to come to the federal circuit. I know there are lots of other issues on appeal. I don't know if the court has any particular questions with respect to those. If not, I'll save my time for a rebuttal. Well, for a rebuttal, would you have to raise your cross appeal to send him to rebuttal? Well, I'm happy to address the issues with respect to the false marking. I believe the statute is very clear. Is that the subject of your cross appeal? The cross appeal was the dismissal of our two claims for patent mismarking and false advertising, so it's spontaneous. And unlike the plaintiff who had an opportunity to replead his claims, we were denied the opportunity to replead. In fact, it wasn't even in response to a motion on which we had the opportunity to brief these issues. The court did so because he deemed that there was no intent to deceive because Mr. Hall was a lawyer. But first of all, intent to deceive is not required for a false advertising claim. And we did plead intent with respect to the false marking claim, and it was inappropriate for the court to decide as a matter of fact that Mr. Hall didn't have the requisite intent for false marking. Does the false marking claim move by the passage of the new act? That's an interesting question. That's why I asked. Certainly, it's one we spend a lot of time discussing. I see that I'm into the red. Would you like me to answer the question? Certainly, statutory damages are no longer available to our client. We would have to prove actual injury from the false marking going forward. There's another issue, too, with respect to the fact that this court decided that Emory Lubricants' decision subsequent to the pleading. So there might need to be some amendment of the false marking claim if the court were to remand it. But in terms of whether we— If it is the liability aspect, would it? Well, there—I think what would have to happen is we would have to afford an opportunity to take discovery to show the damages that were caused by the false representation that the patent was covered by a patent pending at a time when there was no patent application pending. And we were denied the opportunity to do that, much like we were denied the opportunity to even file a motion seeking fees. I think you've answered my question. Thank you. Yes, thank you. A couple of points, Your Honors. With regard to the claims against the individuals and the actions that they took to infringe, our client knows, and he met with the Bed Bath & Beyond people— Your Honor, that's a new issue. I'd like to stick with the items raised in your argument in chief. Okay. Okay. In short—and I think we've hashed out all of the issues. In short, at this point, we believe that the complaint is adequately pledged. It touches all the requirements and ain't a fault only in the case coming out of this circuit. The plaintiffs, or the appellees, were aware. They chose not to move to dismiss the patent infringement claim, and therefore, we believe there was sufficient notice. And the judge's determination to sua sponte, dismiss the case, or to dismiss the patent claim, was an abuse of his discretion and should be reversed by this court. Thank you very much, Your Honors. I would like to. I would like to. With regard to the patent marking, other than, you know, changes, we look back at the time the claims were made. The false patent marking, to our knowledge, there's never been a claim made, a successful claim, of false patent marking where a patent has already been granted. And in this case, Mr. Hall is a retiree. He produced a batch of towels. He labeled them patent pending before the patent was issued. After the patent was issued, he still had a batch, you know, a remainder of the batch of towels that he manufactured. And he sold towels that still bore the patent pending label. And some of the packaging said patent pending, though he received an actual patent. So what's your position on the mootness in light of the American Defense Act? Well, at this point, we believe that there's no liability, certainly, and that there's no reason to continue. You know, again, depending upon where we are in timing, where the court would address this particular issue, at the time it was filed, we believe there's no basis whatsoever. And 12b-6 was clearly warranted a dismissal of those claims because there is no case law they cited, not a single case, to support it. To date, based on the new law, I believe that it's moot because there is no damages. There are no damages. They never were. If I could just quickly address the false advertising. False advertising, it's been alleged, was my client's delivery of an e-mail and a comment at a meeting that if Bed Bath & Beyond decides to manufacture a towel that looks like this towel, they would be infringing his patent. Okay? He said that the design is covered by my patent, though it had not yet been issued at the time that he said that. He's a layperson. When he said it will be covered by my patent, he clearly meant it will be covered by my patent application or my patent once granted. It was a private communication by e-mail. It was not disseminated to the public. It was not commercial language. And based on all the case law from this circuit and other circuits, there's no basis whatsoever for a false advertising claim based on this type of communication between the parties. When, in fact, there was no false statement made, it was true. Any questions, Mr. Shultz? Any questions? Thank you. Thank you very much. I'm assuming you could have one minute at the most to run over and rebuttably honor a cross appeal. Thank you, Your Honor. I'll be extremely brief. The issue was not just one e-mail. It was an e-mail, and it was also repeated representations to Bed Bath & Beyond salespersons. And it was not an inadvertent comment. It was a repeated statement. In fact, Mr. Holland lodged in his own declaration. Dr. Moore, more negotiations than advertising? Your Honor, I believe when you're dealing with a large retailer that you know you're competing for business and you repeatedly state to that customer, I have a patent, and you will infringe it. When you don't even have a first office action yet, you don't know if your patent will issue. And you repeatedly say, I have a patent. I believe that that is advertising a promotion. It's a design patent. It doesn't get examined. Correct. It doesn't get examined for neatness of the law. It also doesn't necessarily get allowed. So it doesn't get examined, but it doesn't necessarily get allowed. And he represented it was a patent when it wasn't. Thank you, Your Honor.